CASE NO. 12-5801

# United States Court of Appeals
# for the Sixth Circuit

CHARLES CURTIS, *et al.*,

*Plaintiffs-Appellants*,

v.

ALCOA, INC. and ALCOA INC., as Fiduciary of the Employees'
Group Benefit Plan of Alcoa Inc., Plan II,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Tennessee

## BRIEF OF DEFENDANTS-APPELLEES

Evan R. Chesler
Daniel Slifkin
Benjamin Gruenstein
CRAVATH, SWAINE & MOORE LLP
  825 Eighth Avenue
    New York, New York 10019
      (212) 474-1000

John A. Lucas
MERCHANT & GOULD, P.C.
  Suite 203
    110 McGhee Tyson Boulevard
      Alcoa, Tennessee 37701
      (865) 380-5978

*Attorneys for Defendants-Appellees*

October 10, 2012

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST OF DEFENDANTS-APPELLEES

Pursuant to Sixth Circuit Rule 26.1, Defendants-Appellees make the following disclosures:

1. Is said party a subsidiary or affiliate of a publicly owned corporation?

   No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

   No.  While defense fees and costs are subject to reimbursement by insurance carriers, those carriers do not have a financial interest in the outcome of the litigation.

October 10, 2012

/s/ Evan R. Chesler
Evan R. Chesler

*Attorney for Defendants-Appellees*

i

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .............................................................iv

CITATION FORMS ....................................................................vi

STATEMENT REGARDING ORAL ARGUMENT ......................................... viii

STATEMENT OF THE ISSUES ............................................................1

STATEMENT OF THE CASE .............................................................3

STATEMENT OF FACTS ................................................................7

SUMMARY OF THE ARGUMENT ..................................................22

ARGUMENT........................................................................24

I.    THE DISTRICT COURT CORRECTLY HELD THAT
      APPELLANTS' RETIREE MEDICAL BENEFITS DID NOT VEST
      PRIOR TO RETIREMENT. ....................................................24

      A.    Standard of Review........................................................24

      B.    Argument...................................................................24

II.   THE DISTRICT COURT DID NOT ERR IN FINDING THAT THE
      COMPANIES AND THEIR UNIONS UNDERSTOOD THAT THE
      CAP AGREEMENTS, WHICH WERE THE SUBJECT OF
      EXTENSIVE NEGOTIATIONS, WERE "REAL". ...................................30

      A.    The district court correctly found that both the Companies and
            the Unions understood that the cap agreements were "real"..............31

      B.    The district court correctly found that the cap was repeatedly
            the subject of negotiations in 1993, 1996 and 2001..........................36

      C.    The 2006 CBA negotiations and cap agreement support the
            court's findings that the earlier cap agreements were real. ...............38

ii

III.    THE DISTRICT COURT DID NOT ERR IN FINDING THAT THE
        2006 CAP WAS PROPERLY IMPLEMENTED UNDER THE 2001
        CBA..................................................................................................41

IV.     THE DISTRICT COURT DID NOT ERR IN DENYING
        APPELLANTS' CLAIMS FOR EQUITABLE RELIEF............................46

        A.    Standard of Review............................................................47

        B.    Argument. ........................................................................47

V.      THE DISTRICT COURT DID NOT ERR BY STRIKING THE
        TESTIMONY OF APPELLANTS' EXPERT RELATED TO
        DAMAGES DURING THE LIABILITY PHASE OF TRIAL. ..................55

CONCLUSION .................................................................................59

CERTIFICATE OF COMPLIANCE

RULE 30(G) DESIGNATION OF RELEVANT DISTRICT COURT
DOCUMENTS

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Al-Zawkari v. Am. S.S. Co., 871 F.2d 585 (6th Cir. 1989) ...................................24

Allied Chem. & Alkali Workers of Am. v. Pittsburgh Plate Glass Co.,
404 U.S. 157 (1971)............................................................................42

Anchor v. O'Toole, 94 F.3d 1014 (6th Cir. 1996) ..................................................47

Bituminous Fire & Marine Ins. Co. v. Izzy Rosen's, Inc., 493 F.2d
257 (6th Cir. 1974)..............................................................................54

Cigna Corp. v. Amara, 131 S. Ct. 1866 (2011) ......................................................54

Gencorp, Inc. v. Am. Int'l Underwriters, 178 F.3d 804 (6th Cir. 1999)................47

Landgraff v. Columbia/HCA Healthcare Corp., 30 F. App'x 366 (6th
Cir. 2002)..............................................................................................53

Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv., 616 F.3d 612 (6th
Cir. 2010)..............................................................................................50

Michigan Exp., Inc. v. U.S., 374 F.3d 424 (6th Cir. 2004) ....................................55

Monsanto Co. v. Geertson Seed Farms, 130 S. Ct. 2743 (2010)............................48

Reese v. CNH Am. LLC, 574 F.3d 315 (6th Cir. 2009) ...................................44, 51

Reese v. CNH Am. LLC, No. 11-1359, --- F.3d ---, 2012 WL
4009695 (6th Cir. Sept. 13, 2012) ................................................44, 45

Scottsdale Ins. Co. v. Flowers, 513 F.3d 546 (6th Cir. 2008) ................................47

Tackett v. M&G Polymers USA, LLC, No. 2:07-cv-126, 2011 U.S.
Dist. LEXIS 86806 (S.D. Ohio August 5, 2011) ...............................32

Trull v. Dayco Prods., LLC, 329 F. Supp. 2d 658 (W.D.N.C. 2004) ....................32

UAW v. Loral Corp., No. 95-3710, 1997 WL 49077 (6th Cir. Feb. 3,
1997) ....................................................................................................29

iv

<u>United States v. Alaska S.S. Co.</u>, 253 U.S. 113 (1920) .........................................53

<u>United States v. Cunningham</u>, 679 F.3d 355 (6th Cir. 2012) ................................56

<u>United States v. Green</u>, 548 F.2d 1261 (6th Cir. 1977).........................................56

<u>United States v. Guzman</u>, 75 F.3d 1090 (6th Cir. 1996)..................................24, 31

<u>Winnett v. Caterpillar, Inc.</u>, 553 F.3d 1000 (6th Cir. 2009) ......................24, 25, 29

<u>Witmer v. Acument Global Techs., Inc.</u>, No. 11-1793, --- F.3d ---,
    2012 WL 4053734 (6th Cir. Sept. 17, 2012) ....................................................33

<u>Wood v. Detroit Diesel Corp.</u>, 607 F.3d 427 (6th Cir. 2010)................................33

<u>Yolton v. El Paso Tenn. Pipeline Co.</u>, No. 02-75164, 2008 U.S. Dist.
    LEXIS 17619 (E.D. Mich. Mar. 7, 2008).........................................................32

**Statutes & Rules**

Employee Retirement Income Security Act of 1974, 29 U.S.C § 1002
    <u>et</u> <u>seq.</u>..............................................................................................................3

Fed. R. Civ. P. 59............................................................................................<u>passim</u>

Labor Management Relations Act of 1947, 29 U.S.C. § 141 <u>et</u> <u>seq.</u>.......................3

# CITATION FORMS

| Citation Form | Description | Date Filed |
|---|---|---|
| RE # | Record Entry Number from the District Court Docket No. 3:06-cv-00448 | |
| DX | Defendant Alcoa Inc.'s Trial Exhibits | |
| PTE | Plaintiffs' Trial Exhibits | |
| 10/17/07 Opinion | Memorandum Opinion in Support of the Order to Strike Plaintiffs' Jury Demand and Motion for Preliminary Injunction, RE 163 | 10/17/07 |
| Compl. | Plaintiffs' Fifth Amended Complaint, RE 169 | 10/30/07 |
| 12/19/07 Order | Consent Order of Class Certification, RE 179 | 12/20/07 |
| 8/27/08 Order | Memorandum and Order Granting Defendant's Motion to Strike and Defendant's Motion for Protective Order, RE 364 | 8/27/08 |
| Summ. J. Tr. | Official Transcript of Proceedings, RE 379 | 9/17/08 |
| 3/19/09 Order | Order Denying Parties' Motion for Partial Summary Judgment and Motion for Summary Judgment, RE 392 | 3/19/09 |
| 8/12/09 Minute Entry | Minute Entry for Proceedings held Before District Judge Thomas W. Phillips, RE 454 | 8/12/09 |
| Trial Tr. | Transcript of Trial Before the Honorable Thomas W. Phillips, United States District Court, Eastern District of Tennessee, RE 485-499 | 10/15/09 |

vi

| | | |
|---|---|---|
| F&C | Findings of Fact and Conclusions of Law, RE 523 | 3/9/11 |
| J. Order | Judgment Order, RE 524 | 3/9/11 |
| Pls.' Mem. in Support of Mot. for Clarification | Plaintiffs' Memorandum in Support of Motion for Clarification and/or Amendment of the Judgment Order, RE 526 | 3/23/11 |
| 6/11/12 Order | Order Denying Plaintiffs' Motion for Clarification and/or Amendment to the Judgment Order and Denying as Moot Plaintiffs' Request for a Hearing on Their Motion for Clarification, RE 541 | 6/11/12 |
| Mordowanec Dep. | Transcript of Deposition of Tom Mordowanec, RE 556-1 | 9/4/12 |
| Br. | Brief of Plaintiffs-Appellants | 9/7/12 |

## STATEMENT REGARDING ORAL ARGUMENT

Appellees respectfully submit that oral argument is unnecessary and would not materially assist the Court in this case because Appellants' challenges are principally to the district court's factual findings, which the court detailed in its extensive ruling and are entitled to great deference on appeal.  Appellants have not identified any legal questions that have not already been authoritatively decided under the controlling law in this Circuit.

## STATEMENT OF THE ISSUES

1.  Did the district court commit clear error in finding that Appellants' retiree medical benefits vested no earlier than at retirement, and even then, subject to a cap, when it determined that the plan documents and extrinsic evidence overwhelmingly supported this finding?

2.  Did the district court commit clear error in finding that each of the 1993, 1996 and 2001 collective bargaining agreements ("CBAs") permitted the capping of retiree healthcare costs, when it found that each CBA clearly stated that a cap would go into effect, each cap was disclosed to the union membership and there was no credible evidence of a "side deal" between the parties that the caps would not go into effect?

3.  Did the district court commit clear error in finding that the 2006 cap negotiated by Alcoa and its union was proper, when that cap was made the subject of mandatory bargaining by the CBAs under which Appellants retired and was more favorable to retirees than those CBAs?

4.  Did the district court abuse its discretion by denying Appellants' claims for equitable relief after finding that Appellants provided no support for a finding of liability?

1

5.    Did the district court abuse its discretion by striking portions of Appellants' expert testimony during the trial's liability phase when that testimony related only to potential damages?

## STATEMENT OF THE CASE

On November 17, 2006, Appellants—a class of former Alcoa and Reynolds employees who had retired between 1993 and 2006, and their spouses and dependents—brought this action under the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 141 et seq., and the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C § 1002 et seq., seeking to enjoin Alcoa from implementing the cap agreement it had negotiated with the United Steelworkers of America Union as part of the 2006 CBA.  (See RE 169, Compl.) Pursuant to the cap agreement, Alcoa agreed to contribute towards retirees' medical benefits, among other amounts, $7,767 per non-Medicare eligible retiree (which was based on a calculation of how much Alcoa had spent in 2006 on retiree benefits).  (RE 523, Findings and Conclusions ("F&C"), 59, 61 ¶¶ 179, 189.) Appellants objected to the requirement that they also contribute to the plan, including through the payment of monthly premiums (up to $150 per couple), co-insurance and deductibles.  Appellants also sought compensatory damages, a declaratory judgment and attorneys' fees and costs.  (RE 169, Compl.)  The district court certified a plaintiff class on December 19, 2007.  (RE 179, 12/19/07 Order, 5-6.)

3

Appellants' essential argument throughout this litigation has been that Alcoa and the Steelworkers Union, as part of the 2006 CBA, were not authorized to implement a cap on the amount that Alcoa would pay for retiree healthcare because Appellants had already retired and the CBAs under which they retired provided them retiree healthcare for life, with no cap on the cost of those benefits. Specifically, Appellants claimed that a series of cap letters that Alcoa and its unions had negotiated in 1993, 1996 and 2001—which by their language authorized Alcoa to put a cap into effect—were a sham, included in the CBAs solely to limit Alcoa's liabilities for accounting purposes but not the actual amount that Alcoa would pay for its retirees. Appellants claimed that there was an oral side agreement between Alcoa and its unions that the caps would never go into effect.

On Appellants' motion for preliminary injunction, the district court recognized that "all of the [cap] letters attached to the collective bargaining agreements beginning with the 1993 agreement appear to clearly permit Alcoa to put a cap on its contribution as early as 1997". (RE 163, 10/17/07 Opinion, 12.) Nevertheless, on cross-motions for summary judgment, the court found that the CBAs and other plan documents were ambiguous as to whether Appellants

4

"vested" in their health benefits upon retirement, such that imposition of a cap constituted a reduction in vested benefits.  (RE 392, 3/19/09 Order, 7.)

In October 2009, the court held an eight-day trial during which it heard testimony from 18 witnesses.  It also considered the deposition testimony of an additional 16 witnesses and over 450 exhibits offered by the parties.  On March 9, 2011, the court issued its Findings of Fact and Conclusions of Law ("F&C" or "Findings and Conclusions").  (RE 523, F&C.) The court concluded that Appellants were not entitled to any benefit beyond what they were already receiving under the 2006 CBA because:  (1) each of the cap letters (negotiated in 1993, 1996 and 2001) was enforceable, as there was never an oral side agreement or shared understanding that the cap letters not be enforced (id. 79-94 ¶¶ 238-75); (2) Appellants' retirement benefits did not vest until their retirement, and thus, vested subject to the cap letters contained within the CBAs under which they retired (id. 68-78 ¶¶ 211-37); and (3) Alcoa had properly implemented the 2001 cap agreement through collective bargaining with the Union in 2006 (id. 94-100 ¶¶ 276-89).

The court issued a Judgment Order accompanying the Findings and Conclusions, dismissing the action and providing that Appellants would "take nothing".  (RE 524, J. Order.)  The court also granted, in part, Alcoa's motion to

5

strike portions of Appellants' expert witness's supplemental report and testimony about damages, since the trial had only addressed the issue of liability.  (RE 523, F&C, 100-01 ¶ 291.)

Following issuance of the Judgment Order, Appellants moved pursuant to Federal Rules of Civil Procedure 59(a)(2) and 59(e) for the district court to alter or amend its judgment on the basis of an "apparent contradiction" between the court's Findings and Conclusions and the Judgment Order.  (See RE 526, Pls.' Mem. in Support of Mot. for Clarification.)  Appellants sought, among other things, a declaration that their retiree medical benefits had vested, claiming that the court had agreed with their position, even though they had sought a ruling that their benefits were both vested and "uncapped".  (Id.)  The court denied the motion on the basis that it had sided with Alcoa, not Appellants, that "[Appellants'] benefits had vested subject to the cap agreements".  (RE 541, 6/11/12 Order, 3-4 (emphasis added).)

Appellants take this appeal both from the district court's Judgment Order dismissing the case and striking portions of their expert's testimony on damages, and from its subsequent denial of Appellants' Rule 59 motion to amend the judgment.

# STATEMENT OF FACTS[1]

## 1.    The Parties

Appellants are a class of former hourly union-represented employees of Alcoa Inc. ("Alcoa") and Reynolds Metal Company ("Reynolds", collectively, "the Companies"),[2] and the spouses, surviving spouses or dependents of such retirees, who retired between June 1, 1993 and June 1, 2006, and are eligible to receive health benefits from the Companies.  (RE 523, F&C, 3 ¶ 1.)  Appellants belonged principally to the United Steelworkers of America Union ("USW") and the Aluminum, Brick and Glass Workers International Union ("ABG", collectively, "the Unions").  (RE 169, Compl., 69 ¶ 22; see also RE 179, 12/19/07 Order.)

## 2.    1992-1993 Collective Bargaining Negotiations

In the early 1990s, the Companies were concerned about rapidly escalating healthcare costs.  (RE 523, F&C, 3-4 ¶¶ 3, 6.)  The Companies were also

---

[1] The Statement of Facts is derived principally from the district court's Findings and Conclusions.  (RE 523, F&C.)

[2] In 2000, Alcoa purchased Reynolds.  (RE 523, F&C, 3 ¶ 2.) As part of that acquisition, Alcoa assumed all of the retiree healthcare and welfare benefit-related duties and liabilities owed to former Reynolds employees, eligible dependents, spouses and retirees under the previous CBAs with Reynolds' unions.  (Id.)

focused on the impact of Financial Accounting Standard 106 ("FAS-106"), a new accounting standard that went into effect in 1992 and would increase the liability for retiree healthcare costs that companies would have to reflect on their balance sheets.  (Id. 5-6 ¶¶ 7, 9.)

The 1988 CBA was due to expire on May 31, 1992.  (Id. 11 ¶ 32.)  In advance of the 1992-1993 CBA negotiations,[3] the Companies engaged in extensive discussions, both internally and with their actuarial consultants, to determine the best approach to dealing with their two-fold healthcare problem.  (Id. 6-7 ¶¶ 10-13.)  The Companies determined that the most effective option to slow the escalation of their healthcare costs and soften the impact of FAS-106 was to implement plan design changes and impose a cap on retiree benefits.  (Id. 7 ¶ 14.)  Based on discussions with their peers, the Companies believed that it was more likely that the Unions would agree to a deferred cap, which would not go into effect until after the term of the CBA, thus softening the impact of future premiums on retirees.  (Id. 8 ¶¶ 18-19.)  The Companies' actuarial consultants advised them that a deferred cap could not be "artificial", that is, one that would never go into

_____

[3] As discussed below, the 1992 negotiations did not result in a new CBA, primarily due to the parties' disagreement over the healthcare costs issue; as a result, the Companies and the Unions agreed to a one-year extension of the existing CBA.  (Id. 11-12 ¶ 32)

8

effect, because such a cap could not be used to reduce the Companies' FAS-106 liability, nor would it reduce the Companies' actual costs.  (Id. 7 ¶ 15.)  On August 18, 1992, the Companies met to discuss the cap, and internal memoranda from those meetings show that they recognized that any cap that they negotiated with the Unions had to be "real".  (Id. 9 ¶ 21 (quoting RE 565-19, PTE 19, at 3 ("[T]he cap will not be used as an artificial way to decrease the liability for accounting purposes.")).)

The Companies met with the Unions repeatedly in advance of the 1992-1993 negotiations, and conveyed their concerns related to rising healthcare costs and the looming FAS-106 liability, and the importance of agreeing upon a cap to address both issues.  (RE 523, F&C, 9-10 ¶¶ 22-27.)  In one meeting, Company representatives confirmed that the actual increase in costs was the principal issue that they were facing, not the impact of FAS-106.  (Id. 10 ¶ 27 (quoting RE 565-33, PTE 33, at 2 ("FASB is not the major problem—runaway costs are—and [the Company] only [has] so much money to spend for compensation.")).)

Alcoa also made presentations to the Unions leading up to the negotiations, during which it communicated its need to cap future retiree healthcare costs.  (RE 523, F&C, 9 ¶ 24.)  Not only were Union representatives

9

made aware of the issues, but local employees were educated on the subject of healthcare costs as well.  (Id. 11 ¶¶ 30-31.)  Paul O'Neill, then-CEO of Alcoa, distributed a memorandum to Alcoa's business unit presidents requesting that they explain the importance of the healthcare issue to employees and report back.  (Id. 11 ¶ 30.)  The report from the Tennessee business unit was that both local union leadership and employees "had been well educated on the subject of healthcare costs".  (Id.; RE 577-8, DX 152, at 2.)

In the spring of 1992, the Companies and the Unions agreed to extend the existing CBA by one year, and as part of the extension agreement, they established a joint committee to examine the problem of rising healthcare costs. (RE 523, F&C, 11-12 ¶¶ 32-33)  The joint committee met on multiple occasions during the summer of 1992 and was assisted by healthcare consultants and experts. (Id. 12 ¶ 33.)

The parties restarted negotiations in September 1992.  At the opening meeting, Mr. O'Neill "announced that Alcoa was seeking substantial changes to employee healthcare in order to manage escalating costs and to comply with FAS-106".  (Id. 12-13 ¶¶ 35-37.)  The Companies told the Unions that savings achieved by reducing healthcare costs could be used to provide employees with other benefits, such as wage increases.  (Id. 13 ¶ 38.)  Ultimately, these

10

negotiations—followed by a subsequent round of negotiations in February 1993—also failed because the parties could not reach agreement on healthcare.  (Id. 13 ¶¶ 38, 40.)  The Companies and the Unions prepared for a strike.  (Id. 13 ¶ 39.)

The parties returned to the bargaining table in May 1993.  Throughout the negotiations that month, the Companies pushed the Unions to accept a cap, and the Unions resisted.  On May 30, 1993—one day before the 1988 CBA was set to expire—the lead Union negotiator deleted the cap from the Companies' proposal, and the Companies responded that they could not agree to the increased pensions they had previously proposed if the Unions did not agree to a cap on retiree healthcare.  (Id. 14 ¶¶ 41-42.)

On the final day of negotiations, the Unions yielded on the issue of a cap.  Hours before the midnight strike deadline, the Unions offered a draft letter to the Companies containing their proposal that the cap would go into effect, but not until January 1, 2001, and at 2000 levels.  (Id. 14 ¶ 43; RE 577-1, DX 5.)  The Unions also proposed that the cap be a mandatory subject of bargaining at future negotiations because, as the court found, "the Unions wanted to have the opportunity to bargain over the cap again before the Companies implemented it". (RE 523, F&C, 14-15 ¶ 44; RE 577-1, DX 5.)  At approximately 1:30 a.m., the Companies provided a draft letter with their counter-offer, namely a cap that would

11

go into effect on January 1, 1998 at 1997 levels; like the Unions' proposal, the cap

would also be a mandatory subject of bargaining in the future.  (RE 523, F&C, 15

¶ 46; RE 577-2, DX 7.)  At approximately 1:55 a.m.—after workers at some plants

had begun to strike—the Unions agreed to the Companies' proposal, as

memorialized in cap letters that were part of the 1993 CBAs.  (RE 523, F&C, 15

¶ 47; see RE 565-9, PTE 9, at 196.)  The Companies also agreed to increased

pensions and 401(k) benefits for employees, in exchange for the Unions'

agreement on the cap.  (RE 523, F&C, 15 ¶ 47.)  At no point did the parties enter

into an oral side agreement that the cap would not engage.  (Id. 16 ¶ 49.)  Nor did

anyone who negotiated the cap on behalf of the Companies suggest to the Unions

that the cap would not go into effect.  (Id. 17 ¶ 51.)[4]

---

[4] Only one Union negotiator at the "top table" (which is where negotiations
over the cap took place) suggested that the Companies and the Unions entered into
a side agreement that the caps were never intended to engage. (Id. 16 ¶ 49.)
However, the district court found that this negotiator (John Murphy, former special
assistant to the President of the ABG) "was unable to identify any explicit
statement" to support his allegations.  (Id. 16 ¶ 49.)  The court did not find
Mr. Murphy's testimony credible; indeed the court found it to be "inconsistent with
the weight of the evidence", as Mr. Murphy was "repeatedly informed" throughout
negotiations that the Companies intended to engage the cap. (Id. 17 ¶ 52.)  In
addition, the other ABG negotiator at the top table, Harvey Martin (former
secretary/treasurer of the ABG), testified that he was not told by any Company
representative that the cap letter would never be implemented.  (Id. 17 ¶ 51.)

After the negotiations concluded, the Unions informed their local officials and members that the parties had agreed to a cap.  (Id. 18 ¶ 56.)  In advance of the ratification vote, the Union leadership made presentations to the membership that disclosed the cap and did not mention an oral side agreement.  (Id. 20-21 ¶ 63.)

The 1993 cap letter was published by Alcoa in its CBAs and clearly provided that the cap, which would be subject to mandatory bargaining in the future, would engage in 1998 at 1997 levels.  (Id. 22 ¶ 69; RE 565-9, PTE 9, at 196.)[5]  The Companies and the Unions also entered into memoranda of settlement at the conclusion of the negotiations, and those too clearly disclosed the cap agreement.  (RE 523, F&C, 20 ¶ 62; see, e.g., RE 577-7, DX 177, at 28 ("Plan costs capped at expected 1997 levels.").)[6]  In the days following the negotiations, Alcoa distributed a memorandum to personnel managers at ABG plants that described the new medical plan design.  It too explained that the parties had agreed

---

[5] As the court found, in 1993, Reynolds entered into the same cap written agreement with the Unions as Alcoa did with its Unions.  (RE 523, F&C, 22 ¶¶ 69-70; see, e.g., RE 566-5, PTE 40; see also RE 577-3, DX 17 (1996).)

[6] These memoranda of settlement were entered at the conclusion of negotiations and the district court found they were intended to be "a complete summary of the agreement reached by the parties".  (RE 523, F&C, 20 ¶ 62.)

upon a cap.  (RE 523, F&C, 22 ¶ 68; RE 577-9, DX 180, at 3.)  Likewise, the

Summary Plan Descriptions ("SPDs") issued pursuant to the 1993 CBAs, and

incorporated by reference, stated unambiguously that retiree benefits would be

subject to a cap.  (RE 523, F&C, 23-25 ¶¶ 73-77; see, e.g., RE 577-5, DX 20, at

28.)

**3.    1996 Negotiations**

The 1993 CBA was due to expire on May 31, 1996, and leading up to

those negotiations, the Companies continued to express concern about rapidly

escalating healthcare costs.  (RE 523, F&C, 30 ¶¶ 94-95.)  The Companies met

several times at pre-negotiation meetings and discussed that the cap would be a

subject of bargaining in the upcoming negotiations.  (Id. 31 ¶ 96.)  They

contemplated the possibility of deferring the cap beyond the term of the 1996

CBA, but only as part of an "overall economic package negotiated with the

Unions".  (Id. 31 ¶ 97; see RE 565-32, PTE 32, at 4.)  Alcoa's actuaries addressed

Alcoa's concerns about moving the cap, advising that if the cap were rolled over

the plan could continue to be recognized as capped.  (RE 523, F&C, 32-33 ¶¶ 102-

03.)

The caps were the subject of negotiations in May 1996.  (Id. 33-34

¶¶ 104-06.)  The Unions proposed deleting the cap, and the Companies countered

14

that they would implement the cap.  (Id. 33-34 ¶ 105.)  The parties considered the costs of different options, including deferring the cap three or six years, or removing it altogether.  (Id.)  Ultimately, the parties agreed to defer implementation of the cap until 2003, after the 1996 CBA term.  (Id. 34 ¶ 106; see, e.g., RE 576-1, DX 13, at 169-70.)  The Companies elicited a concession from the Unions in exchange for the deferral, namely lower wages for active employees. (RE 523, F&C, 34 ¶ 106.)  Again, the parties did not enter into a "side deal" that the cap would never engage.  (Id. 34 ¶ 107.)

As happened in 1993, the 1996 cap letter was published by Alcoa in its CBA and clearly provided that the cap, which would be subject to mandatory bargaining in the future, would engage in 2003 at 2002 levels.  (Id. 37 ¶ 114; see, e.g., RE 576-1, DX 13, at 169-70.)  In addition, the memorandum of settlement agreed to by the parties and provided to Union members disclosed the cap.  (RE 523, F&C, 35 ¶ 108.)  Likewise, the SPDs issued pursuant to the 1996 CBA, and incorporated by reference, included "clear and unambiguous" descriptions of the cap that was negotiated in 1996.  (Id. ¶¶ 115-16; see, e.g., RE 565-5, PTE 5, at 28.)[7]

---

[7] Appellants point to one SPD from 1997 that does not contain a reference to the cap agreement.  (RE 575-7, DX 53.)  With respect to this SPD, the court

After the negotiations, Alcoa and the Unions worked together on a clarification letter for employees explaining the cap; that letter contained the same explicit language as the SPDs.  (RE 523, F&C, 37 ¶ 113 ("Alcoa will cap the amount it pays for retiree medical coverage on January 1, 2003, unless the parties reach an agreement before this date.").)

**4.    2001 Negotiations**

The 1996 CBA was due to expire on May 31, 2002, but the parties engaged in "re-opener negotiations" one year earlier.  (Id. 42 ¶ 127.)  In advance of the 2001 negotiations, Alcoa[8] recognized that escalating healthcare costs continued to be a "very serious problem".  (Id. 40 ¶ 122.)  In preparation for the re-opener negotiations, Alcoa commissioned actuarial evaluations of different plan design

---

observed that, unlike other SPDs distributed at the time, it was sent to both Union and non-Union employees (who were not covered by the cap).  (RE 523, F&C, 39 ¶ 118; RE 575-7, DX 53.)  And, unlike the other SPDs with specific language that the cap would go into effect after the CBA expired, this 1997 SPD contains "much stronger" language concerning vesting:  "Alcoa may change the level of benefits provided under [the plan] at any time. . . .  Benefits under the plan are not vested." (RE 523, F&C, 39 ¶ 118 (quoting RE 575-7, DX 53, at 89).)  The court likewise considered and rejected a similar argument with respect to a single 2001 SPD. (F&C, 47-48 ¶ 143; RE 577-6, DX 71.)

[8] Alcoa acquired Reynolds in 2000, and the ABG merged into the USW in 1997 (referred to for the remainder of this section as the "Union").  (RE 523, F&C, 40 ¶ 120.)

16

changes, including implementing the cap in 2003, as provided for in the 1996 CBA.  (Id. 40-41 ¶ 123.)  Alcoa's auditors advised that the cap could be deferred one more time, but a deferral beyond that would result in the plan being viewed as "uncapped" under FAS-106, in which case Alcoa would not be permitted to report reduced future liabilities.  (Id. 41 ¶ 126.)

During re-opener negotiations in May 2001, Alcoa initially proposed to implement the cap and the Union countered that the cap should be eliminated.  (Id. 42 ¶¶ 127-29.)  Alcoa advised that it would consider moving the cap if the USW would agree that retirees pay insurance premiums.  (Id. 42 ¶ 129.)  The parties did not negotiate a new CBA in May 2001, due in part to the disagreement over the cap.  (Id. 44 ¶ 134.)

The parties resumed negotiations in the fall of 2001, at which time the Union continued to press to eliminate the cap and Alcoa continued to assert that it would move the cap only in exchange for an agreement that some retirees would begin to pay monthly premiums.  (Id. 44 ¶ 135.)  Ultimately, Alcoa agreed to withdraw its demand for retiree premiums, and the parties agreed to defer implementation of the cap until 2007, before which it would be a subject of mandatory bargaining.  (Id. 45 ¶ 137; RE 577-4, DX 18, at 192.)  As in 1993 and

1996, the parties did not enter into an oral side deal that the cap would never be engaged.  (RE 523, F&C, 45-46 ¶ 138.)

As the court found, the 2001 cap letter that Alcoa published in its CBA clearly provided that the cap would go into effect in 2007 at 2006 levels, and would be a mandatory subject of bargaining.  (Id. 46 ¶ 140; RE 577-4, DX 18, at 192.)  SPDs issued pursuant to the 2001 CBA, and incorporated by reference, also included "clear and unambiguous" descriptions of the cap that was negotiated in 2001.  (RE 523, F&C, 47 ¶ 141; see, e.g., RE 575-8, DX 64, at 40.)

## 5.    2005-2006 Negotiations

Soon after the 2001 negotiations, Alcoa projected that its retiree healthcare costs would increase by nearly 50% by 2006.  (RE 523, F&C, 48-49 ¶ 146.)  Based on the rising cost of healthcare and the accounting implications that would surely come with deferring the cap a third time, Alcoa determined to implement the cap in 2007 and conveyed that to the Union.  (Id. 49-50 ¶¶ 148-50.)

The first CBA negotiations took place in May 2005, and the parties could not reach an agreement at the time, in part due to the Company's insistence on engaging the cap.  (Id. 51, 53 ¶¶ 154, 160.)  Around the same time, the Union investigated allegations that there had been an oral side agreement that the cap would never engage, but found no support for the allegations and concluded that

18

the cap letter was enforceable.  (Id. 54-55 ¶ 166.)  After negotiations in 2005

failed, the Union distributed a newsletter to its members explaining the history of

the cap agreements, including that the Unions had agreed to a cap in 1993, 1996

and 2001 (id. 55 ¶ 167; RE 577-10, DX 331); at no point did the Union suggest

that the cap letters were never intended to engage.  (RE 523, F&C, 55 ¶ 167.)

In advance of the next round of negotiations, Alcoa continued to insist

that the cap be implemented according to the 2001 CBA.  (Id. 57 ¶ 172.)  The

Union concluded that it lacked the bargaining power to defer the cap again, and

that absent additional negotiation surrounding how the cap would be implemented,

the retirees would face significant monthly premiums.  (Id. 57 ¶ 173.)

Accordingly, the Union agreed that the cap would be engaged and shifted its focus

to negotiating a set of plan design changes that would benefit the retirees who

would be subject to that cap.  (Id. 57-58 ¶¶ 173-77.)

The Union requested that the premiums to be imposed on retirees

remain flat over the course of the term covered by the CBA.  Alcoa agreed, and

premiums were set at $75 per month for non-Medicare eligible participants and

$40 for Medicare eligible participants throughout the term of the CBA.  (Id. 59

¶ 178; RE 577-11, DX 346, at 9.)  The parties also agreed to create a "notional"

account to lessen the burden on the retirees.  (RE 523, F&C, 59 ¶ 179; RE 577-11,

19

DX 346, at 10-11; RE 577-12, DX 347, at 2-3.)  As set out in the 2006 cap letter,

Alcoa would contribute the capped amount ($7,767 per year for pre-Medicare

retirees) into the notional account, even if actual healthcare costs were lower.  (RE

523, F&C, 59, 60, 63 ¶¶ 179, 183, 194; RE 577-12, DX 347, at 1-4.)  Alcoa also

agreed to make a contribution of at least $50 million into the notional account.

(RE 523, F&C, 59, 64 ¶¶ 179, 197; RE 577-12, DX 347, at 2-3.)  The notional

account, into which retiree premiums would also be contributed, would be used to

pay for the retirees' healthcare costs, and any amount remaining at the end of the

CBA would be carried forward to offset retiree expenses until the account is

exhausted.  (RE 523, F&C, 59, 63 ¶¶ 179, 194; RE 577-12, DX 347, at 3; see also

RE 523, F&C, 59 ¶ 180.)  Alcoa also committed to making two lump-sum

payments of $1,500 each to surviving spouses of retirees.  (RE 523, F&C, 60 ¶

182; RE 577-11, DX 346, at 12.)  None of these additional expenditures was

required of Alcoa under the 2001 cap agreement, which authorized Alcoa to

implement a cap in 2007.  (RE 523, F&C, 46 ¶ 140; see RE 577-4, DX 18, at 192.)

        Following the 2006 negotiations, the Union distributed a summary to

its membership describing the negotiations, which stated:  "Instead of a high-

stakes, all-or-nothing strategy, the Union sought an alternative approach which

would allow the Company to retain its cost cap without requiring retirees to bear

the brunt of healthcare inflation . . . . These changes will not be painless, but together they enabled your Bargaining Committee to maintain high-quality retiree healthcare benefits at premiums that retirees could afford." (RE 523, F&C, 60-61 ¶ 184 (quoting RE 577-11, DX 346, at 7-8).) The Union membership ratified the proposed 2006 CBA, including the cap agreement. (RE 523, F&C, 61 ¶ 184.)

## SUMMARY OF THE ARGUMENT

The district court correctly found that the cap agreements that Alcoa and the Unions negotiated in 1993, 1996 and 2001 authorized them to implement a cap on retiree medical benefits in 2007.

First, the court found that the written terms of the plans under which Appellants retired—contained in the CBAs, the SPDs and the memoranda of settlement—unambiguously authorized Alcoa to engage a cap.

Second, the court found, based on its review of extrinsic evidence, that Appellants' retiree benefits vested only at retirement and then subject to the future imposition of a cap. The court rejected Appellants' attempts to create a right to vested benefits while they were still active employees from isolated language in the plan documents taken out of context. Indeed, just as the plain language of the caps themselves provided for a cap, the court also found that "the evidence presented at trial overwhelmingly support[ed] the conclusion that the parties understood the cap to be real", and that there was no secret side agreement between Alcoa and the Union that the cap was a sham and would never be engaged.

In seeking to introduce extrinsic evidence to show that the cap agreements—which the district court had found to be unambiguous—were not real, Appellants faced an uphill battle at trial. Appellants decidedly lost that battle, as

22

the court found that the extrinsic evidence strongly favored Alcoa.  Appellants now seek to overturn the district court's decision, contending that the court incorrectly weighed the extrinsic evidence.  Such factual determinations, rooted in the court's careful review of the evidence presented at trial—including its assessment of the credibility of the witnesses who testified at the trial—are subject to a strong presumption against reversal, and are only reviewed for clear error.  The court found that this was not a close case, as there was no credible evidence that the sophisticated parties to the cap letters reached a secret handshake agreement that Alcoa would never enforce its rights under the letters.  Appellants can identify no clear error that led the court to reach this result.  As such, this appeal fails.

# ARGUMENT

## I.    THE DISTRICT COURT CORRECTLY HELD THAT APPELLANTS' RETIREE MEDICAL BENEFITS DID NOT VEST PRIOR TO RETIREMENT.

### A.    Standard of Review.

Appellants assert that "[q]uestions of contract interpretation are generally considered questions of law subject to de novo review". (Br. 15.) This statement of the standard is incomplete, as "[f]indings of fact with regard to the extrinsic evidence [considered in contract interpretation cases] are accorded the benefit of the clearly erroneous standard of review". Al-Zawkari v. Am. S.S. Co., 871 F.2d 585, 589 n.7 (6th Cir. 1989). In addition, where "the findings rest on credibility determinations, even greater deference is required". United States v. Guzman, 75 F.3d 1090, 1096 (6th Cir. 1996).

### B.    Argument.

The district court found that Appellants' benefits vested only at retirement, and even then subject to a cap on retiree medical benefits that had been negotiated, agreed and disclosed by their Unions prior to their retirement. (RE 523, F&C, 100 ¶ 289.) In support of its conclusion that Appellants' benefits vested only at retirement, the court, relying on this Court's decision in Winnett v. Caterpillar, Inc., 553 F.3d 1000 (6th Cir. 2009), observed that "Sixth Circuit law is

24

clear that in the absence of explicit contractual language demonstrating vesting, retiree medical benefits do not vest prior to retirement."  (RE 523, F&C, 71 ¶ 219.) Reviewing the applicable plan documents, as well as all of the extrinsic evidence that Appellants now seek to rely upon, the court found they "do not support [Appellants'] contention that their retiree health benefits vested with their pension benefits".  (Id. 74 ¶ 226.)

Appellants appear to argue that the district court erred in requiring "explicit contractual language" for a finding of an intent to vest prior to retirement, when this Court in Winnett, 553 F.3d at 1008, also authorized courts to consider "in the case of ambiguous contract language, extrinsic evidence indicating such an intent".  (Br. 22.)  However, Appellants ignore the fact that the court did consider the extrinsic evidence and testimony that Appellants offered and concluded that the extrinsic evidence did not remotely support a finding of vesting prior to retirement. (RE 523, F&C, 77-78 ¶¶ 233-34 (reviewing testimony of Appellants' witnesses and concluding that they "understood that health benefits did not vest prior to retirement"); id. 77-78 ¶ 235 (finding that "[t]he extrinsic evidence shows that the Unions and the Companies negotiated over health benefits during each successive round of collective bargaining, demonstrating to the court the parties' understanding that such benefits could be changed or reduced").)

25

Appellants further point to several exhibits and related testimony that they claim show dispositively that their benefits vested before retirement. None of those documents provides a basis to conclude that the district court's factual finding that Appellants' benefits did not vest before retirement was clearly erroneous.

First, Appellants point to a single document to support their contention that "Alcoa's own documents made it clear that vesting occurred after five years of service rather than upon actual retirement". (Br. 19; RE 574-33, PTE 286.) However, that document, which includes summaries of the Alcoa and Reynolds retirement plans relates exclusively to pension, not medical, benefits and makes clear that pension benefits vest after an employee completes five years of service. (E.g., RE 574-33, PTE 286, at 79.) In fact, the only witness to testify at trial about this document (who was Appellants' own witness) testified that this is a booklet about pension plans. (RE 491, Trial Tr. 9/25/09, 999:10-16.)[9]

---

[9] The court also based its conclusion that Appellants' retiree benefits did not vest after five years of service on the testimony of Appellants' witnesses that an employee's retirement benefits could change at any time prior to the employee's retirement, and that they retired subject to the last negotiated agreement, and not the agreement in place at the time they completed five years of service. (RE 523, F&C, 77 ¶ 233-34.)

Second, Appellants rely on references within Alcoa's plan documents to the phrase "active vested employees" to assert that the parties intended for vesting in medical benefits while employees are still active.  (Br. 19.)  However, the district court considered each of those documents and found no support for Appellants' position.  Appellants offered no evidence that "active vested employees" in any of these documents refers to active employees who are vested in their <u>retiree health benefits</u> versus active employees who are vested in their <u>pensions</u>.  (RE 523, F&C, 74 ¶ 226.)  Furthermore, the court noted that all of the SPDs containing the "active vested" language "also either explicitly disclose the cap or explicitly provide that benefits do not vest".  (<u>Id.</u>)  And, with respect to the CBAs incorporating these SPDs, each document made clear "that those who are <u>receiving</u> a pension will be eligible for retiree health benefits", and not simply those who are <u>eligible</u>.  (<u>Id.</u>)[10]  Appellants have not addressed any of those findings on appeal.

---

[10] Appellants also purport to rely on the testimony of Nicolaas Storm, Alcoa's senior labor and benefits counsel, which they say "should have been conclusive" on the issue that "active vested employees" were vested in their medical benefits. (Br. 22.)  However, as the court found, Mr. Storm made clear that references to "active vested employee[s]" in Alcoa's documents refer to employees who were vested for pension benefits, not retiree health benefits.  (RE 523, F&C, 27 ¶ 86; RE 497, Trial Tr. 9/30/09, 1773:2-12.)  That Mr. Storm testified that surviving spouses of employees vested in their pension would receive medical benefits does not

Third, Appellants claim that the "definitive example" of Alcoa's intent to vest retiree benefits prior to retirement is a 1992 document that contains the phrase "active employees . . . who have 'vested' in the retiree medical and life benefit". (Br. 19-20.)  Again, contrary to Appellants' argument, the district court did not "ignore[ ] this evidence" (Br. 20), but rather found that the relevant portion of the document, which appears to be an attachment to an accounting memorandum, is a reference to vesting in the accounting sense, not in the legal sense. (RE 523, F&C, 27-28 ¶¶ 87-88.)  As the court noted, "'vested' is a term of art under FAS-106 that refers to . . . 'an employee's right to receive present or future benefits whether or not the employee remains in the service of the employer'", and "bears no relation to whether a company has the right to change employees' benefits in future negotiations". (Id. 27-28 ¶ 88.)[11]

Fourth, Appellants argue that the fact that "an active employee can pass retiree healthcare benefits to a surviving spouse for life prior to actual

---

suggest, as Appellants argue (Br. 23), that the employees themselves had vested medical benefits while they were active.

[11] In addition, the court noted that this exhibit was an incomplete document, and without any additional context, a finding with respect to the "type of legal vesting that [Appellants] must demonstrate in order to prevail" was not possible. (Id. 27 ¶ 87.)

28

retirement or retirement eligibility compels but one conclusion—that pre-
retirement (i.e., non-terminable) vesting was the logical intent of the language".
(Br. 21.)  The district court correctly held, relying on this Court's decision in
Winnett, that the fact of this benefit does not constitute "explicit[ ]" language
demonstrating that healthcare benefits vested at the time an employee became
eligible for a pension or retirement.  (Id. 75-76 ¶¶ 228, 229 (citing Winnett, 553
F.3d at 1009).)  At most, the court observed that surviving spouse benefits "may be
an indication of vesting upon the employee's death, but not prior to death".  (Id.
75-76 ¶ 229.)[12]

*      *      *

Appellants fail to raise any plausible arguments that the retiree health
benefits at the center of this case vested at any point prior to the employees' actual

---

[12] Appellants cite UAW v. Loral Corp., No. 95-3710, 1997 WL 49077, at *3
(6th Cir. Feb. 3, 1997), for the proposition that "[i]t [is] an impossible construction
of the Plan to provide lifetime benefits for the surviving spouses but to [allow the
company to] terminate the underlying benefits".  (Br. 21.)  However, the issue in
Loral was whether the company could unilaterally reduce retiree benefits provided
for in a CBA after that agreement expired, and the district court, affirmed by this
Court, found it an "impossible construction" that a surviving spouse could receive
benefits while the retirees' underlying benefits would be reduced and terminated.
1997 WL 49077, at *3.  Id. at *3-4.  Here, by contrast, the very CBAs under which
Appellants retired provided that a cap would go into place after the expiration of
those CBAs, which would affect both retirees and their surviving spouses.

retirement.  The district court's findings were not in error and this Court should affirm the ruling.

## II.    THE DISTRICT COURT DID NOT ERR IN FINDING THAT THE COMPANIES AND THEIR UNIONS UNDERSTOOD THAT THE CAP AGREEMENTS, WHICH WERE THE SUBJECT OF EXTENSIVE NEGOTIATIONS, WERE "REAL".

In advance of trial, the district court ruled that "the cap letters unambiguously allowed Alcoa to implement health care caps as early as 1997, ten years before their actual implementation".  (RE 392, 3/19/09 Order, 7.)  Appellants argued that, notwithstanding the plain text of the caps, extrinsic evidence would show that Alcoa had no ability to impose a cap.  The court set the case for trial to consider whether the extrinsic evidence supported Appellants' contention that "Alcoa and the Union had an oral agreement that the cap agreements would never be implemented against the plaintiff retirees".  (Id. 13.)  Yet rather than conclude that the extrinsic evidence overcame the text of the caps, the district court found that "the evidence presented at trial overwhelmingly supports the conclusion that the parties understood the cap to be real".  (RE 523, F&C, 88 ¶ 261.)

Appellants recognize that the court "spent considerable time analyzing the extrinsic evidence" in this case before concluding that it was "overwhelmingly" counter to their version of the facts, but contend that the court's finding was clearly

30

erroneous.  (Br. 25.)  In fact, Appellants go so far as to say that it was the evidence they put forward—which they claim showed "the cap letters were actually accounting devices never intended to be implemented against the Retirees"—that was "overwhelming".  (Id.)  Within Appellants' rhetoric is an accurate statement of their burden:  to demonstrate that the contrary evidence was so "overwhelming" as to make the court's findings "clearly erroneous".  And that burden is even higher here, where the court's findings were rooted in the credibility of the witnesses who testified at trial.  Guzman, 75 F.3d at 1096.  Appellants widely fail to meet their burden.

## A.    The district court correctly found that both the Companies and the Unions understood that the cap agreements were "real".

The district court rejected Appellants' argument that the Companies and the Unions "regarded [the cap letters] as sham agreements intended only to disguise the nature of the Companies' retiree obligations for accounting purposes". (RE 523, F&C, 82-83 ¶ 246.)  The court found:  (1) that such an interpretation of the cap letters had no basis in their language, which clearly authorized the Companies to impose such a cap;[13] (2) that it was "incredulous that the

---

[13] Appellants now argue, as an aside, that "if 'Alcoa's authority to cap the [Appellants'] retiree healthcare benefits [was] clearly set forth in the cap agreements of 1993, 1996 and 2001,' extrinsic evidence should have been

sophisticated parties in this case entered into an agreement" to engage in deceptive accounting; and (3) that both parties to the cap agreements—Alcoa and the Steelworkers—took the position during the litigation that the caps were real. (RE 523, F&C, 81-86 ¶¶ 244, 246, 253.) In the face of these findings, Appellants unsuccessfully attempt to reargue the significance of the documents and testimony upon which they relied at trial.

First, Appellants cannot overcome, with any amount of extrinsic evidence, the fact that the clear language of the cap letters authorized Alcoa to implement a cap in 2006.[14] Appellants attempt to do so, at least with respect to the

---

irrelevant". (Br. 25.) Alcoa argued this as well in support of its motion for summary judgment (see RE 392, 3/19/09 Order, 6), and continues to believe that this case could have been decided exclusively on the language of the cap letters given the court's conclusion that the cap letters unambiguously permitted the implementation of a cap. (Id. 7.) Having sought to base their case on extrinsic evidence since the outset, Appellants cannot now identify the court's decision to consider extrinsic evidence as a basis for reversal.

[14] This is a key distinction between this case and another case that Appellants rely upon: Yolton v. El Paso Tennessee Pipeline Co., No. 02-75164, 2008 U.S. Dist. LEXIS 17619 (E.D. Mich. Mar. 7, 2008). In Yolton, the "cap" language merely included a promise that the cap would not be implemented earlier than a specific date. Id. at *7. Likewise, Appellants' attempt (Br. 39-45) to analogize to two district court cases similarly fails, given that the courts there found that the cap was for accounting purposes only and never intended to be implemented. Tackett v. M&G Polymers USA, LLC, No. 2:07-cv-126, 2011 U.S. Dist. LEXIS 86806, at *41-42 (S.D. Ohio August 5, 2011); Trull v. Dayco Prods., LLC, 329 F. Supp. 2d 658, 674 (W.D.N.C. 2004). Here, by contrast, the district court rejected such a

Reynolds cap letters, by noting that they "were intentionally <u>not included</u> in the published 1993 and 1996 CBAs, instead being placed in a 'confidential file' so that retirees could not view them". (Br. 27.) However, the district court found that the cap agreements were clearly disclosed to the Reynolds union members, both through informational materials provided by Reynolds to the Unions and through the SPDs. (RE 523, F&C, 20-38 ¶¶ 63, 74, 108, 115.) Appellants also point to the fact that each letter provided that the cap would go into effect <u>after</u> the term of the CBA. The district court, however, concluded that this was entirely consistent with a real cap because "the cap letters all made clear that, absent negotiation to the contrary, the cap <u>would</u> engage during the following CBA period". (<u>Id.</u> 84-85 ¶ 251.)

      <u>Second</u>, Appellants can only point to one statement allegedly made by a top table participant to argue that the parties reached an oral side agreement that the cap would never engage, namely that Russ Porter, Alcoa's lead negotiator,

---

finding. (RE 523, F&C, 92 ¶ 270.) Far more relevant are this Court's decisions in <u>Wood v. Detroit Diesel Corp.</u>, 607 F.3d 427 (6th Cir. 2010), and more recently in <u>Witmer v. Acument Global Technologies, Inc.</u>, No. 11-1793, --- F.3d ---, 2012 WL 4053734 (6th Cir. Sept. 17, 2012). In both cases, this Court concluded that retirees' attempts to ignore clear limits on benefits in the relevant CBAs—after having agreed to the limits in negotiations—were impermissible. <u>Witmer</u>, 2012 WL 4053734, at *4; <u>Wood</u>, 607 F.3d at 432.

allegedly told John Murphy, one of the two top table ABG negotiators, in a private conversation that the cap was a "paper transaction". (Br. 31.) However, as the district court found, "Murphy's testimony is inconsistent with the weight of the evidence, as he was repeatedly informed from 1991 through the May 1993 negotiations, through presentations, proposals and negotiations, that the Companies intended to implement a cap on retiree health benefits". (RE 523, F&C, 17 ¶ 52.) Indeed, Mr. Murphy "was unable to identify any explicit statement by either Company that the cap would never be implemented" and he conceded on cross-examination that Mr. Porter "never told him that the cap would never be implemented". (Id. 16 ¶ 49.)[15]

Third, Appellants rely on testimony and documents reflecting the mere opinions of people who were not at the "top table", where the cap agreements were actually negotiated, to infer the intent of the parties to those agreements. As the district court found, the benefits administrators who Appellants claim never informed them that their benefits were subject to a cap, and the local union representatives who Appellants claim never would have agreed to a cap (Br. 28-29,

---

[15] In addition, Mr. Porter testified that he never used the phrase "paper transaction" and, in fact, had never discussed the cap privately with Mr. Murphy. (Id. 16 ¶ 49.)

35) were not present for negotiations over the cap.  (RE 523, F&C, 40-87 ¶¶ 159, 257-58.)[16]

       <u>Fourth</u>, Appellants continue to argue that the use of the phrase "caps with a wink" by some Reynolds employees shows that the parties viewed the cap as a sham (Br. 31-33), but that argument fails for the same reason that led the district court to reject it.  As the district court found, the phrase, which some

---

[16] Appellants continue to cite to an email in which they claim one Alcoa employee (Mary Ellen Lammel, Alcoa Director of Benefits) stated that she had heard that the company had told the Unions that the cap "was only for accounting purposes".  (Br. 26 n.13.)  As an initial matter, this is a clear misreading of the email.  The email does not quote Ms. Lammel directly, but is rather a report by another employee that she heard from a <u>third</u> employee that Ms. Lammel had made such a statement.  Moreover, the author of the email noted in the email that she was not sure whether her source had accurately interpreted what Ms. Lammel had said.  (RE 567-15, PTE 89, at 1.)  Moreover, as the district court found based on all of the evidence (including Ms. Lammel's testimony), she "understood that Alcoa intended to engage the caps, and she never heard anyone indicate to the Unions that the caps would never engage".  (RE 523, F&C, 36-37 ¶ 112.)

Appellants likewise recount a story from 2001, in which several local union representatives supposedly told an Alcoa representative (Thomas Mordowanec, former Alcoa Director of Employee Benefits for North America) that the earlier cap letters would never engage and that he initially disagreed.  Subsequently, Appellants state, Mr. Mordowanec said, "You was right, I was wrong".  (Br. 33.)  The district court, however, found that only the top table negotiators had authority to negotiate caps, and Mr. Mordowanec never sat at the top table.  (RE 523, F&C, 43-44 ¶ 133.)  Moreover, Mr. Mordowanec testified that he never made such a statement, and did not believe that the caps were never intended to engage.  (RE 556-1, Mordowanec Dep., 39:15-40:14.)

Reynolds employees did use in internal meetings, did not refer to caps that would never engage, but rather to caps that "don't energize or engage during the term of the contract". Not only did the Reynolds negotiator who used the phrase testify to this, but it was confirmed by a Union negotiator who heard him use the phrase. (RE 523, F&C, 31-32 ¶ 98.)[17]

### B.   The district court correctly found that the cap was repeatedly the subject of negotiations in 1993, 1996 and 2001.

Appellants next dispute the district court's conclusion that the real bargaining that took place over the cap was evidence that the parties understood the cap agreements to be real. Appellants contend that there never could have been real bargaining over the cap because the Unions made it clear throughout that they would not accept cost-shifting. However, Appellants at no point dispute the actual evidence of negotiations that the court found in each of the CBA negotiations; as such, they cannot claim that the court committed clear error.

---

[17] Relatedly, Appellants argue that the fact that the cap was deferred three times shows that it was viewed as a sham. (Br. 34.) As the district court concluded, while the Companies had agreed to defer the cap in the course of negotiations, this did not render the cap anything less than "a real cap". (RE 523, F&C, 91-92 ¶ 268.) Moreover, the district court observed that Appellants "have not provided any plausible explanation why the Union proposed to delete the caps and bargained over their terms if the caps were not real". (Id.)

First, Appellants ignore the extensive evidence that the Companies viewed the caps as a means of addressing not just the accounting implications of FAS-106, but also the serious concerns about the rising cost of healthcare. This evidence showed that as early as the 1993 negotiations, the rise of actual healthcare costs was at least as significant a concern as the accounting implications of FAS-106. (RE 523, F&C, 10 ¶ 27.) These same concerns were apparent in subsequent negotiations. (Id. 34-49 ¶¶ 106, 122, 148.)

Second, Appellants ignore the back-and-forth that took place between the parties in each of the negotiations over the cap, including in 1993 when the Companies and the Unions passed between them a proposal and a counter-proposal of the cap letter in the final hours before the strike, and even after the strike had already commenced. (Id. 14-15 ¶¶ 43-47.) Nor do Appellants address the attempts by the Companies to engage the cap in 1996 and 2001 and efforts by the Unions to delete it. This disagreement was one of the principal causes for cutting off negotiations. (Id. 33-42 ¶¶ 105, 129.) As the district court found, there would have been no reason to engage in any discussion of the cap, much less the level of repeated negotiation that took place here, if no one thought it would engage. (Id. 91-92 ¶ 268.)

Third, Appellants ignore the concessions that the Companies and the Unions exchanged for agreeing to a "deferred" cap in 1993 and rolling the cap over in 1996. As the district court found, in 1993 the Companies agreed to enhanced pensions and 401(k) benefits for employees in exchange for the Unions' agreement to the deferred cap proposal. (Id. 15 ¶ 47.) And in 1996, the Unions agreed to reduced wage increases in exchange for the movement of the caps. (Id. 34 ¶ 106.) As the court observed, "[i]f the parties had agreed in 1993 never to engage the caps, the Unions' willingness to give up wages in exchange for movement of the caps would not make sense". (Id.)

### C.    The 2006 CBA negotiations and cap agreement support the court's findings that the earlier cap agreements were real.

Appellants next argue that the Union's reaction in 2006 to Alcoa's proposal to implement the cap, and the language of the 2006 cap letter itself, demonstrate that the parties understood that earlier cap letters were never intended to engage.[18] Appellants, however, ignore the fact that the Union took the position

---

[18] Appellants also contend that Alcoa only stopped deferring the cap in 2006 because of its auditors' concerns with "the 'Enron issue'". (Br. 35.) What this means is unclear. And it ignores the fact that Alcoa planned to implement the cap during negotiations as early as 2002, and that the district court found that Alcoa's auditors advised them in connection with those negotiations that they would not be able to defer the cap a third time in 2006. (RE 523, F&C, 41, 49 ¶¶ 126, 147.)

during both those negotiations and this litigation that the 1993, 1996 and 2001 cap agreements were real and that Alcoa had the authority to implement the cap in 2006. (Id. 61 ¶ 185; RE 577-13, DX 351, at 1-2.)

First, Appellants rely on unsigned notes of a meeting attended by Union representatives, about which there was no testimony at trial, to argue that the Union felt that Alcoa's decision to implement the cap was a reversal of its earlier position that the cap would never engage. (Br. 35.) Appellants, however, ignore the fact that the Union rejected the assertion by John Murphy and certain local union representatives that the cap was never intended to be engaged. As Jim Robinson, the Union's corporate designee and top-table negotiator in 2005 and 2006, testified, "neither the Union's nor his personal understanding was that the cap was intended never to be implemented". (RE 523, F&C, 53 ¶ 163.)[19]

Second, Appellants observe that the 2006 cap letter was longer and more detailed than the earlier letters, suggesting that the 2006 letter was the only

_____

[19] Appellants further assert that in 2006 "there was a side deal between [Joe Quaglia, Alcoa's lead negotiator] and Mr. Robinson that was to be off the record". (Br. 36.) They do not explain, however, what the off-the-record agreement was, or how it bolsters their argument that the Union recognized that the cap letter was a sham. And both Mr. Quaglia and Mr. Robinson testified that they had no secret side agreement. (RE 499, Trial Tr. 10/1/2009, 1966:21-1967:2; RE 523, F&C, 53-55 ¶¶ 163-166.)

one that was meant to be implemented.  (Br. 36-37.)[20]  That difference is unsurprising, as each of the prior cap letters set the cap to go into effect after the following round of collective bargaining, and made the cap a mandatory subject of bargaining.  Certain details simply could not have been put in the earlier letters, such as the precise amount of the cap (which was to be calculated based on medical costs in the final year of the CBA).  And other details were the product of extensive negotiation—precisely what the earlier cap letters authorized, and expected, the parties to do.

*     *     *

In sum, the court did not err in finding that Appellants presented no credible evidence—much less evidence that was sufficient to carry their burden— that the Companies and the Unions viewed the cap agreements as a sham, never to be implemented.

_____

[20] Appellants additionally claim, as they did at trial, that the earlier cap agreements were described by Alcoa's witnesses as "not decipherable", suggesting that the parties understood that they would never go into effect.  (Br. 36.)  As an initial matter, this is contrary to the district court's finding that the letters "clearly and unambiguously" authorized Alcoa to engage a cap.  (RE 523, F&C, 87 ¶ 257.)  Moreover, these witnesses testified that their uncertainty was over how the cap would be implemented and "not whether or not there was a cap".  (E.g., RE 495, Trial Tr. 9/29/2009, 1451:22-25.)

40

III.  **THE DISTRICT COURT DID NOT ERR IN FINDING THAT THE 2006 CAP WAS PROPERLY IMPLEMENTED UNDER THE 2001 CBA.**

Appellants argue that, even if Alcoa had the right under the 2001 CBA to implement a cap in 2006, it was done in an improper manner because the plan design changes that went into effect with the cap resulted in the retirees paying premiums for their healthcare before Alcoa's per-retiree costs reached the cap amount.  (Br. 46.)  The district court correctly rejected this argument, and there is no basis to revisit it.

First, as the district court correctly found, each of the pre-2006 cap agreements required that there be mandatory collective bargaining before imposition of the cap, and the 2006 cap was implemented after such bargaining. (RE 523, F&C, 22-58 ¶¶ 69, 114, 140, 174.)  The district court found that it was the Union that insisted that retirees pay premiums in the earlier years of the CBA—even before the cap level was reached—so as to flatten out premiums over the course of the CBA.  (Id. 59 ¶ 179.)  Appellants now challenge what their Union bargained for, pursuant to authority given to the Union by the retirees during the time when they were active members.  Indeed, the district court found that the Companies made real concessions to the Union during those earlier negotiations— when the retirees were active members—in exchange for the implementation of the

41

mandatorily bargained caps.  (E.g., id., 15 ¶ 47.)  Appellants cannot now claim that the Unions lacked the ability to bargain on their behalf, when they enjoyed the benefits of those negotiations while they were active employees.[21]

Second, the district court correctly found that the plan design changes that the Union negotiated with Alcoa as part of the implementation of the cap were "more favorable to the retirees than a package that simply implemented the 2001 cap would have been".  (RE 523, F&C, 96 ¶ 280.)  As the district court noted, the Union recognized that absent some form of cost sharing through plan design changes—including a change to a 90/10 insurance plan, with out-of-pocket maximums and deductibles—premiums for some retirees would rise to as much as $500 per month in five years.  (Id.)  Of course, that would far exceed the actual monthly premiums that were negotiated in 2006, which would not exceed $75 per retiree, or $150 per couple.  (Id. 59 ¶ 178.)

Third, contrary to Appellants' assertions, Alcoa never paid less than the cap amount for Appellants' retiree benefits.  In fact, as the district court found,

---

[21] Relatedly, Appellants' reliance on Allied Chem. & Alkali Workers of Am. v. Pittsburgh Plate Glass Co. for the proposition that unions cannot bargain away vested retirement benefits is misplaced.  (Br. 29 n.16 (citing 404 U.S. 157, 173 n.20 (1971)).)  Unlike in that case, where the union did not represent retirees, here, bargaining over a cap was required by the CBAs to which the retirees were parties.

"[t]he 2006 plan design changes imposed <u>additional</u> costs on Alcoa that Alcoa was not required to pay under the 2001 cap agreement". (<u>Id.</u> 97 ¶ 283 (emphasis added).) For example, Alcoa created a notional account to which it contributed at least $50 million, which would be used to pay for retiree benefits once the cap was reached. (<u>Id.</u> 64 ¶ 197.) The notional account was designed to "reduce retiree contributions when plan costs rise above the cap set in the 2006 CBA", by requiring Alcoa to contribute the difference between its healthcare costs and the cap level to the account. (<u>Id.</u> 63 ¶ 194.) As the district court observed: "The excess over the plan costs is put into the notional account to offset any future costs of the plan and thereby to reduce retiree contributions." (<u>Id.</u>) Moreover, the district court observed that Alcoa agreed to make two special payments of $1,500 to each surviving spouse that it had not previously been obligated to make. (<u>Id.</u> 60 ¶ 182) Accordingly, contrary to Appellants' assertion that Alcoa is paying less than the cap amount, it is actually paying far more.[22]

---

[22] Appellants also assert that the current plan costs Alcoa $600,000 less per month than an implementation of the cap and that Alcoa contributed approximately $1.7 million less per month under the plan than it should have. (Br. 45-46.) Those assertions ignore the funds that Alcoa has contributed to the notional account, which the district court held must not be ignored. (RE 523, F&C, 97 ¶ 283.)

Fourth, the district court correctly found that, to the extent the 2006 plan design changes constituted a change from what was authorized by the 2001 cap agreement, that change was "clearly reasonable" under Reese.  (Id. 100 ¶ 289 (citing Reese v. CNH Am. LLC, 574 F.3d 315, 318 (6th Cir. 2009) (Reese I)).) Appellants claim that Reese only covers "administrative changes", such as a change to providers or services covered by a plan.  (Br. 47-48.)  However, there is no support for that in the Reese I decision, or in the Sixth Circuit's most recent decision in the ongoing Reese litigation.  See Reese v. CNH Am. LLC, No. 11-1359, --- F.3d ---, 2012 WL 4009695 (6th Cir. Sept. 13, 2012) (Reese II).

In Reese, a group of retirees vested in their health coverage brought suit over changes that their employer unilaterally made to their plan.  Reese I, 574 F.3d 315 at 318.  This Court concluded that those benefits had, in fact, vested for the retirees bringing suit.  Id. at 323.  This Court held, however, that for such vested retirees, the company "cannot terminate all health-care benefits for retirees, but it may reasonably alter them".  Id. at 327.  Reese I was explicit that these "reasonable" changes could be unfavorable to vested retirees, holding that it was contrary to "common sense" to require "that these benefits must be maintained precisely at the level provided for in the 1998 CBA".  Id.  Putting aside the question whether Reese applies here, where there was no unilateral change in

44

benefits but rather a change that was the result of mandatory bargaining required by the CBAs negotiated while the retirees were all active members, there is no suggestion in that case that "reasonable" changes are limited to mere "administrative" changes, as Appellants argue.

That was definitively decided by this Court's recent decision in Reese II, when it provided six factors for courts to consider when determining "reasonableness".  Those factors are:  (1) the relative average annual total out-of-pocket cost to retirees for their healthcare under the new and old plans; (2) the relative average per-beneficiary cost to the company under the new and old plans; (3) relevant premiums, deductibles and copayments that retirees must pay under the new and old plans; (4) the differences between the quality of care available under the new and old plans; (5) the differences between the new plan and the plan available to current employees and new retirees; and (6) the differences between the new plan and plans available to retirees and workers at similar companies with demographically similar employees.  Reese II, 2012 WL 4009695, at *3-4.  The Court's consideration of these factors—including its review of the plan's changing premiums, deductibles and other out-of-pocket costs—makes clear that even non-administrative charges can be "reasonable".  Moreover, a review of the district court's ruling in this case shows that it made explicit findings on all six of these

45

factors.[23]  In short, even if the retirees did not authorize the Union to negotiate on their behalf, which they did, the district court had strong support for its conclusion that any such alterations were reasonable.

## IV.    THE DISTRICT COURT DID NOT ERR IN DENYING APPELLANTS' CLAIMS FOR EQUITABLE RELIEF.

Appellants argue that the district court erred in failing to grant injunctive, declaratory and "other equitable relief", all aimed at preventing Alcoa from "unilaterally reduc[ing], without restriction" their benefits in the future.  (Br. 48.)  Appellants made a similar argument for injunctive and declaratory relief following the trial in support of their motion to amend the judgment.  (RE 526, Pls.' Mem. in Support of Mot. for Clarification.)  The district court denied that motion on the grounds that "Alcoa is permitted to modify its benefits plans with

---

[23] See, e.g., RE 523, F&C, 63-97 ¶¶ 280 (the new plan "kept retiree contributions consistent with past levels"); 282 (finding that "[t]he evidence established that Alcoa has been paying at least the level of the cap and continues to pay at least as much paid on a per capita basis before 2006"); 280-81 (finding minimal deductibles and co-pays relative to the future costs of the old plan); 196 (finding that "the Union believed that the plan design changes permitted retirees to maintain high quality benefits at affordable premiums"); 195 (finding the 2006 changes "commensurate with other plan design changes Alcoa made to the benefits of current employees"); 281 (finding credible testimony "that Alcoa's plan is consistent with the plans that other employers have negotiated with the USW").

changes that are reasonably commensurate with the benefits provided in the CBA". (RE 541, 6/11/12 Order, 4.)  Appellants provide no basis to upset that ruling.

### A.    Standard of Review.

Denials of equitable relief are reviewed for abuse of discretion. Anchor v. O'Toole, 94 F.3d 1014, 1025 (6th Cir. 1996).  Denial of a motion to alter or amend the judgment is also reviewed for abuse of discretion.  Gencorp, Inc. v. Am. Int'l Underwriters, 178 F.3d 804, 832 (6th Cir. 1999).  An abuse of discretion is found when there is a "definite and firm conviction that the trial court committed a clear error of judgment".  Scottsdale Ins. Co. v. Flowers, 513 F.3d 546, 563 (6th Cir. 2008).

### B.    Argument.

Appellants' requests for equitable relief are all rooted in the same principal argument:  that such relief is necessary to restrain Alcoa from future conduct that would "increase the [ ] costs to the point where the retirees are forced to drop the coverage altogether".  (Br. 53.)  However, there has been no indication that Alcoa has so much as contemplated taking any such action.

### 1.    Appellants' Arguments for Injunctive Relief Fail.

In finding that the 2006 plan design resulted in a richer plan for Appellants than they would have received had Alcoa unilaterally implemented the

47

2001 cap without satisfying its mandatory bargaining obligations, the district court noted that Alcoa's actuaries estimated that the notional account "should allow retiree premiums to remain constant until 2017". (RE 523, F&C, 99-100 ¶ 288.) Appellants appear to seek injunctive relief to prevent Alcoa from increasing premiums before 2017. (Br. 51-52.) The district court did not abuse its discretion in denying such relief.

First, Appellants do not articulate, much less attempt to satisfy, the standards for obtaining injunctive relief, which the Supreme Court has recognized to be "a drastic and extraordinary remedy, which should not be granted as a matter of course". Monsanto Co. v. Geertson Seed Farms, 130 S. Ct. 2743, 2761 (2010). A permanent injunction is available only if the plaintiff can demonstrate: (1) "it has suffered an irreparable injury"; (2) "that remedies available at law . . . are inadequate"; (3) that the injunction is "warranted" in light of the "balance of hardships between the plaintiff and defendant"; and (4) "that the public interest would not be disserved by a permanent injunction". Id. at 2756 (internal quotation marks omitted). Appellants simply assert that an injunction is appropriate because their benefits can be "unilaterally reduced, without restriction, at any time" and Appellants "have no way to defend against this practice". (Br. 48.) Of course, this is untrue, as Appellants can always seek an injunction in the future should Alcoa

48

take such unilateral action—something they sought to do here at the outset of the lawsuit, and which they have been litigating ever since.

Second, Appellants rely on the baseless conviction that, if left unchecked, Alcoa will increase premiums so high that retirees will be "forced to drop their healthcare coverage entirely". (Br. 48.) Putting aside the question of why an injunction would be the appropriate remedy now, the district court found no evidence that Alcoa has any intention, or has taken any action, to terminate Appellants' benefits, or even to reduce the amount it spends on retiree healthcare.[24] (E.g., RE 523, F&C, 96-97 ¶ 282 ("Alcoa has been paying at least the level of the cap and continues to pay at least as much paid on a per capita basis before 2006").)

Third, it is inaccurate for Appellants to say that a denial of injunctive relief renders meaningless the district court's findings that "'the 2006 CBA will ensure that no further plan design changes will be necessary until 2017'". (Br. 50 (quoting RE 523, F&C, 99-100 ¶ 288).) That was one fact that the court relied

---

[24] In support of their contention, Appellants half-heartedly assert that Alcoa's "goal" is to exit the retiree healthcare business. (Br. 48.) However, at no point has Alcoa suggested it would cease paying for Appellants' benefits. In fact, Alcoa's counsel has represented that Alcoa has no intention of falling short of its contractual obligation to provide benefits at a capped level. (RE 379, Summ. J. Tr., 87 ("Alcoa's paying almost $8,000 per person pre-Medicare. We'll continue to do that for the rest of [Appellants'] lives.").)

upon in assessing the reasonableness of the 2006 plan design changes, but the court recognized that it was based on Alcoa's actuaries' estimates and not a contractual obligation. Nothing in the court's ruling suggests that the court intended to preclude Alcoa and the Union from negotiating additional plan design changes until 2017.

Fourth, and in addition to all of the above reasons, Appellants cannot demonstrate that the district court erred in denying their Rule 59(e) motion after trial because the 2010 plan design changes that Appellants brought to the court's attention—such as a $10 increase (at most) in monthly premiums beginning in 2011 and an additional $5 increase beginning in 2013 (Br. 52)—did not constitute "new evidence" that warranted amending its ruling. Such changes were the sort of modest modifications that Reese permitted. The district court did not ignore this "new" evidence,[25] as Appellants suggest (Br. 52-53), but rather the court held that Alcoa is permitted to make future modifications that are "reasonably

---

[25] In fact, this evidence was not new at all; it was available to Appellants at least eight months before the district court issued its Order. See Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv., 616 F.3d 612 (6th Cir. 2010) (affirming that evidence available prior to the district court's ruling does not constitute "newly discovered evidence").

commensurate" with the benefits provided in the CBA.  (RE 541, 6/11/12 Order, 4

(citing <u>Reese I</u>, 574 F.3d at 326).)

   <u>Fifth</u>, Appellants claim that Alcoa made certain "misstatements" to

them, and on that basis they should have received equitable relief.  (Br. 49.)

According to Appellants:  (1) retirees were told "they would get the benefits they

had at the time they retired, with Alcoa paying the cost"; and (2) retirees were not

told that "there was a cap on retiree healthcare benefits".  (<u>Id.</u>)  Based on the

weight of the evidence, Appellants are wrong.  The district court found:

(1) Appellants were told, in fact, that they were entitled to lifetime health benefits

vested at the time of their retirement, but the benefits were <u>subject to a cap</u> (RE

523, F&C, 78 ¶ 237)[26]; and (2) this cap was clearly and unambiguously

communicated to Appellants (<u>id.</u> 87, 93 ¶¶  257, 271-72).

   2. <u>Appellants' Request for Declaratory Relief Fails.</u>

   Appellants also argue that it was error for the district court not to note

in its Judgment Order—which simply dismissed their case and ordered that "the

---

[26] Indeed, the court found no evidence that Appellants were misinformed about
the implementation of cap letters.  Appellants relied on alleged misstatements by
Alcoa HR representatives who told employees that their benefits were "for life"
upon retirement.  (<u>Id.</u> 87 ¶ 257.)  The court considered deposition testimony of one
such administrator, Carol Story, and found that "she never told anyone that such
payments would <u>not</u> be required", contrary to Appellants' assertion.  (<u>Id.</u> 87 ¶ 258.)

[Appellants] take nothing" (RE 524, J. Order)—that Appellants' health benefits were vested for life.  (Br. 53-54.)  The district court considered, and rejected, this argument in denying Appellants' Rule 59(e) motion.  That decision was correct, and most certainly not an abuse of discretion.

Appellants mischaracterize their initial request for declaratory relief and their position throughout this case, as they never argued that their benefits were merely vested—but that they were vested and uncapped.  (RE 169, Compl., 30 ¶ 4 (seeking "declaratory judgment stating that [Appellants] have vested welfare benefits . . . unreduced from those . . . provided to [Appellants] at the time of retirement"); id. ¶ 5 (seeking reformation of the plan to provide "that said benefits shall not be reduced from the level provided . . . at the time [Appellants] retired"); see also id. 30 ¶¶ 2-3.)  As the district court, which was familiar with Appellants' position during the course of the litigation, recognized:  "[Appellants] argued throughout this litigation that they were entitled to unlimited healthcare for life because they retired with vested, uncapped benefits" and that their benefits should be returned to pre-2007 levels.  (RE 541, 6/11/12 Order, 3 (emphasis added).)  Likewise, the court's ruling was not simply that Appellants' retiree benefits were vested but rather that Appellants "were vested in their healthcare benefits subject to the limitations imposed by the cap".  (RE 523, F&C, 100 ¶ 289).  Accordingly, a

52

declaratory judgment that their benefits were vested—period—would have been both inconsistent with the district court's findings and outside the scope of relief that Appellants had sought.

Furthermore, Appellants fail to explain why such declaratory relief is even necessary, given that it has no bearing on the outcome of the case.  See United States v. Alaska S.S. Co., 253 U.S. 113, 116 (1920) (noting the "settled principle" that a court "will determine only actual matters in controversy essential to the decision of the particular case before it"); see also Landgraff v. Columbia/ HCA Healthcare Corp., 30 F. App'x 366, 368 (6th Cir. 2002) (concluding the district court did "not abuse its discretion by failing to grant an equitable remedy when it . . . found no violation of [ERISA]").  As the district court here found, Alcoa provides Appellants more than the vested benefits to which they were entitled under the CBAs in existence when they retired.  (RE 541, 6/11/12 Order, 5; RE 523, F&C, 98-99 ¶¶ 286-87.)  As such, Appellants seek declaratory relief that would do nothing more than declare as vested a level of benefits that is less than what Alcoa is actually paying on behalf of retirees.

3.   There Is No Basis To Grant "Other Equitable Relief".

Appellants assert it was error for the district court not to grant their request for other, unspecified equitable relief (Br. 55), but they offer no basis for granting the relief they request.

Appellants first assert the district court "should have reformed the plan to accurately reflect what the Retirees had been told and lived under for 13 years prior to 2006". (Id.) Courts will reform a contract upon a showing of: "mutual mistake . . . or a mistake of one party induced by the other's fraud". Bituminous Fire & Marine Ins. Co. v. Izzy Rosen's, Inc., 493 F.2d 257, 261 (6th Cir. 1974). There is no evidence supporting such a finding here.[27]

Appellants further contend that the district court should have "estopped Alcoa from denying what it had promised the retirees". (Br. 55.)

---

[27] Appellants rely on Cigna Corp. v. Amara, 131 S. Ct. 1866 (2011), for their assertion that "other appropriate equitable relief" should have been granted (Br. 55), but that case is clearly not on point, as the Supreme Court there considered equitable remedies because the employer provided false and misleading information about the level of benefits in its SPDs. Amara, 131 S. Ct. at 1881-82. Here, the district court found no violation of the law as the CBAs and their respective SPDs clearly and unambiguously communicated the cap agreements. (E.g., RE 523, F&C, 87 ¶ 257.) And the district court considered the testimony of certain union representatives who testified they understood the cap would never be implemented and found it not credible. (See, e.g., id. 17-52 ¶¶ 52, 57, 60-61, 71, 157.)

Appellants, however, do not claim that they satisfied the elements of an equitable estoppel claim: "(1) misrepresentation by the party against whom estoppel is asserted; (2) reasonable reliance on the misrepresentation by the party asserting estoppel; and (3) detriment to the party asserting estoppel". <u>Michigan Exp., Inc. v. United States</u>, 374 F.3d 424, 427 (6th Cir. 2004) (internal quotation marks omitted). Appellants did not prove those elements with respect to any individual class member, and certainly could not have satisfied them on a class-wide basis.

\*   \*   \*

In sum, Appellants have failed to demonstrate that the facts in this case warrant any extraordinary measure of equitable relief. The district court did not abuse its discretion when it denied Appellants any equitable relief and decided that Appellants should "take nothing" and dismissed their claims.

## V. THE DISTRICT COURT DID NOT ERR BY STRIKING THE TESTIMONY OF APPELLANTS' EXPERT RELATED TO DAMAGES DURING THE LIABILITY PHASE OF TRIAL.

At trial, Appellants offered the expert testimony of Ian Altman, an actuary who the court previously ruled would testify "only as to the value of the FAS-106 letter and its inherent ambiguity". (<u>See</u> RE 364, 8/27/08 Order, 1-2.) During trial, Alcoa moved to strike portions of Mr. Altman's testimony on several grounds, including that his testimony related, in several instances, to Appellants'

claims for damages, which were irrelevant at the liability phase. Simultaneous with its ruling in the case, the district court granted Alcoa's motion to strike 12 sections of Mr. Altman's testimony because "testimony that pertain[s] to plaintiff's damages [was] not relevant" to the liability phase. (RE 523, F&C, 100-01 ¶ 291.)

   The exclusion of expert testimony is reviewed for abuse of discretion. United States v. Cunningham, 679 F.3d 355, 377 (6th Cir. 2012). Indeed, this Court has long held that such matters are "left traditionally to the sound discretion of the trial court", and should be upheld unless "manifestly erroneous". United States v. Green, 548 F.2d 1261, 1268 (6th Cir. 1977) (internal quotation marks and citation omitted).

   Prior to trial, the parties agreed and the district court ruled that the trial would be bifurcated into a liability phase and a damages phase. (RE 454, 8/12/09 Minute Entry, 1.) Approximately three months before trial, Appellants' expert submitted a supplemental report in which he purported to calculate that Appellants were owed between $581 and $857 million in damages. Alcoa moved to strike the report. The district court ruled that it would permit testimony on mixed questions of liability and damages. (RE 523, F&C, 100-01 ¶ 291.)

   At trial, Mr. Altman repeatedly crossed the line from liability to damages. For example, he sought to quantify the impact on Appellants resulting

56

from imposition of the cap, which he characterized as "money that will come from the plaintiffs bearing the cost of the medical benefits because Alcoa will no longer be paying them".  (RE 490, Trial Tr. 9/24/09, 846-47:21-15; see also id. 858:3-6 ("[P]articipants are paying out millions of dollars as a result [of the cap]… Ultimately, they will pay out 111 Million."); id. 859:12-25 ("$83 million of damages will be incurred because of [the purported difference in cap levels]").)  In fact, upon cross-examination, Mr. Altman conceded that he had "clearly" offered his opinion during his direct examination as to the damages that Appellants suffered.  (RE 491, Trial Tr. 9/25/09, 916-17:6-12.)

Appellants cannot point to any error, much less manifest error, that the court committed in striking those portions of Mr. Altman's testimony related to damages.  (RE 523, F&C, 100-01 ¶ 291.)  Appellants do not cite to a single piece of testimony they believe to have been improperly excluded or the basis on which that exclusion would have been error.  While Appellants argue that "Mr. Altman attempted to walk a fine line between the mixed questions of liability and damages" (Br. 57), they fail to explain what those mixed questions were and why their burden at the liability phase required that their expert address questions of damages.  Moreover, Appellants point to nothing in the Findings and Conclusions

suggesting that they did not prevail at the liability phase for failure to quantify the damages they suffered.

## CONCLUSION

For all of the foregoing reasons, Appellees respectfully submit that the district court properly dismissed Appellants' claims, denied their motion to amend the judgment and ordered that portions of the testimony of their expert witness be stricken.  Accordingly, Appellees respectfully request that this Court affirm those decisions.

October 10, 2012

/s/ Evan R. Chesler
Evan R. Chesler
Daniel Slifkin
Benjamin Gruenstein
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, New York 10019
(212) 474-1000
echesler@cravath.com

John A. Lucas
MERCHANT & GOULD, P.C.
Suite 203
110 McGhee Tyson Boulevard
Alcoa, Tennessee 37701
(865) 380-5978
jlucas@merchantgould.com

*Attorneys for Defendants-Appellees*

59

# CERTIFICATE OF COMPLIANCE

**Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements**

1.    This brief complies with the type-volume limitation of Fed. R. App. P.
32(a)(7)(B) because the brief contains 13,669 words, excluding the parts of
the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and 6 Cir. R. 32(b)(1).

2.    This brief complies with the typeface requirements of Fed. R. App. P.
32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because
the brief has been prepared in a proportionally spaced typeface using
Microsoft Word 2007 in Times New Roman 14-point font.

Date:  October 10, 2012

/s/ Evan R. Chesler
Evan R. Chesler

*Attorney for Defendants-Appellees*

## RULE 30(G) DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| Record Entry | Description | Page ID Number |
|---|---|---|
| 169 | Plaintiffs' Fifth Amended Complaint, dated October 30, 2007 | \<pageID>[28] |
| 526 | Plaintiffs' Memorandum in Support of Motion for Clarification and/or Amendment of the Judgment Order, dated March 23, 2011 | 12755 |
| 523 | Findings of Fact and Conclusions of Law, dated March 9, 2011 | 12647 |
| 524 | Judgment Order that Plaintiffs Shall Take Nothing and Dismissing Action with Prejudice on the Merits, dated March 9, 2011 | 12748 |
| 541 | Order Denying Plaintiffs' Motion for Clarification and/or Amendment to the Judgment Order and Denying as Moot Plaintiffs' Request for a Hearing on their Motion for Clarification, dated June 11, 2012 | 13126 |
| 163 | Memorandum Opinion in Support of the Order to Strike Plaintiffs Jury Demand and Motion for Preliminary Injunction, dated October 17, 2007 | 566 |
| 179 | Consent Order of Class Certification, dated December 19, 2007 | 644 |

---

[28] The district court (Eastern District of Tennessee) did not make a page number available on the ECF docket entry.

| Record Entry | Description | Page ID Number |
|---|---|---|
| 364 | Memorandum and Order Granting Defendant's Motion to Strike and Granting Defendant's Motion for Protective Order, dated August 27, 2008 | 7353 |
| 392 | Order Denying Parties' Motion for Partial Summary Judgment and Motion for Summary Judgment, dated March 19, 2009 | 7855 |
| 454 | Minute Entry for Proceedings held Before District Judge Thomas W. Phillips on August 12, 2009 | 8731 |
| 542 | Notice of Appeal as to Judgment (524), Order on Motion to Alter Judgment, Order on Motion for Hearing (541), and Findings of Fact & Conclusions of Law (523) | 13131 |
| 379 | Official Transcript of Summary Judgment Proceedings, held on August 27, 2008 | 7569 |
| 490 | Transcript of Trial Proceedings, held on September 24, 2009 | 10490 |
| 491 | Transcript of Trial Proceedings, held on September 25, 2009 | 10602 |
| 495 | Transcript of Trial Proceedings, held on September 29, 2009 | 11109 |
| 497 | Transcript of Trial Proceedings, held on September 30, 2009 | 11401 |
| 499 | Transcript of Trial Proceedings, held on October 1, 2009 | 11685 |
| 565-33 | PTE 33, Notes from Meeting between Companies and Unions, dated January 16, 1992 | 15916 |

| Record Entry | Description | Page ID Number |
|---|---|---|
| 565-19 | PTE 19, Memorandum from Linda Burke, dated August 21, 1992 | 15671 |
| 577-5 | DX 20, Summary Plan Description pursuant to 1993 CBA between Alcoa and USW | 23771 |
| 577-7 | DX 177, Memorandum of Settlement, dated May 11, 1993 | 23889 |
| 565-9 | PTE 9, CBA between Alcoa and USW, dated May 31, 1993 | 15216 |
| 577-1 | DX 5, Proposed Letter of Agreement between Company and Union, dated May 31, 1993 | 23662 |
| 566-5 | PTE 40, Letter from Robert Newman to John Murphy, dated June 1, 1993 | 16004 |
| 574-33 | PTE 286, Summary Plan Description of Employees' Retirement Plan of Alcoa, Plan II, dated June 1, 1993 | 21704 |
| 577-2 | DX 7, Proposed Letter of Agreement between Company and Union, dated June 1, 1993 | 23663 |
| 577-9 | DX 180, Memorandum from R. Peterson and J. Michaud, dated June 7, 1993 | 23949 |
| 577-8 | DX 152, Memorandum from G. E. Bergemon, dated August 18, 1993 | 23939 |
| 565-32 | PTE 32, Alcoa/Reynolds Pre-Negotiations Meeting Minutes, dated April 5, 1995 | 15911 |
| 567-15 | PTE 89, Email from Laura Ashley to Joseph Quaglia, dated September 2, 2005 | 16918 |

| Record Entry | Description | Page ID Number |
|---|---|---|
| 565-5 | PTE 5, Summary Plan Description pursuant to 1996 CBA between Alcoa and ABG | 14950 |
| 576-1 | DX 13, CBA between Alcoa and USW, dated May 31, 1996 | 23543 |
| 577-3 | DX 17, Letter from Stephen Weidman to John Murphy, dated June 10, 1996 | 23664 |
| 575-7 | DX 53, Retiree Benefits Handbook as of April 1, 1997 | 23186 |
| 577-6 | DX 71, Retiree Benefits Handbook as of January 1, 2001 | 23835 |
| 577-4 | DX 18, Agreement between Alcoa and USW, dated May 31, 2001 | 23665 |
| 575-8 | DX 64, Summary Plan Description, pursuant to 2001 CBA, effective April 1, 2002 | 23290 |
| 577-10 | DX 331, Master Contract Negotiations Update #2, dated August 28, 2005 | 23953 |
| 577-11 | DX 346, Summary of June 2006 Tentative Agreement between USW and Alcoa | 23954 |
| 577-12 | DX 347, Retiree Healthcare Letter from Joseph Quaglia to Jim Robinson, dated June 1, 2006 | 23992 |
| 577-13 | DX 351, Letter from USW, dated July 24, 2006 | 23998 |
| 556-1 | Plaintiffs' Deposition of Tom Mordowanec, held on June 22, 2007 | 13875 |

## CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2012, the foregoing Brief of

Defendants-Appellees was filed via this Court's CM/ECF system and thereby was

served upon all counsel of record.

Dated at New York, New York, on October 10, 2012.

/s/ Evan R. Chesler
Evan R. Chesler

*Attorney for Defendants-Appellees*